AO 106 (Rev. 04/10) Application for a Search Warrant

FILED
Clerk
District Court
OCT 03 2022
for the Northern Mariana Islands
By_____ /s/
    (Deputy Clerk)

# UNITED STATES DISTRICT COURT
for the
District of the Northern Mariana Islands

FILED
Clerk
District Court
MAY 12 2022
for the Northern Mariana Islands
By _____ /s/
        (Deputy Clerk)

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
The Subject Property – consisting of sixteen (16) cell ) Case No. MC22    00032
phones; one (1) desktop computer; one (1) digital video )
recorder ("DVR"); and one (1) computer tablet – currently )
in the possession of the DEA Office on Guam )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*: The Subject Property – consisting of sixteen (16) cell phones; one (1) desktop computer; one (1) digital video recorder ("DVR"); and one (1) computer tablet – currently in the possession of the DEA Office on Guam. See ATTACHMENT A, which is incorporated fully herein.

located in the _____---_____ District of   the Northern Mariana Islands  , there is now concealed *(identify the person or describe the property to be seized)*:
Evidence of violations of Conspiracy to Possess with Intent to Distribute a Federally Controlled Substance, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and Conspiracy to Maintain a Drug-Involved Premises, in violation of 21 U.S.C. §§ 856(a)(1) and 846. See ATTACHMENT B, which is incorporated fully herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1) and 846 | Conspiracy to Possess with Intent to Distribute a Federally Controlled Substance |
| 21 U.S.C. §§ 856(a)(1) and 846 | Conspiracy to Maintain a Drug-Involved Premises |

The application is based on these facts:
See attached Affidavit in Support of a Search Warrant, which is incorporated fully herein.

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Robert DeRocher, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: May 13, 2022

City and state: Saipan, CNMI

*Judge's signature*

Ramona V. Manglona, Chief Judge
*Printed name and title*

GRB

## AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

I, Robert J. DeRocher, Special Agent (SA) of the Drug Enforcement Administration (DEA), hereinafter referred to as Affiant, being duly sworn, do depose and state that:

## I.  INTRODUCTION

1. I am currently employed as a Special Agent with the Drug Enforcement Administration and have been so employed for approximately 23 years. I am also an investigative or law enforcement officer of the United States within the meaning of Section 878(a) of Title 21, United States Code, in that I am empowered by law to conduct investigations and to make arrests for federal felony offenses, and have been so employed since November 1998.

2. I attended the Basic Agent Training Academy in November 1998. Upon graduation, I was transferred to Riverside, California, where I investigated and participated in several hundred narcotic trafficking cases. From April 2006 through April 2008, I was assigned to the Foreign Deployed Advisory Support Team. I investigated major narcotics dealers in Afghanistan and trained foreign police agencies in counter narcotics during this assignment. I was transferred to the Saginaw Resident Office in June 2008, and in 2015 the office transferred to Flint, Michigan. In March 2020, I was assigned to the Saipan Post of Duty where I am presently assigned. In February 2009, I completed the Advanced Agent Training conducted by the Drug Enforcement Administration.

3. Over the course of my employment as a Special Agent, I have conducted and participated in hundreds of criminal investigations which have resulted in arrests for crimes involving controlled substance violations, firearms violations, terrorism, narcotics funding of terrorism, and arms trafficking. Many of these crimes resulted in subsequent convictions in State, Federal, and Foreign Courts. I also have written and executed or participated in the planning and

execution of State and Federal search warrants which have led to the arrest and conviction of many individuals. These search warrants have resulted in my testimony in State and Federal Courts.

4. My experience as a DEA Special Agent further includes, but is not limited to: physical surveillance, interviewing witnesses, supervising the purchases of controlled substances by undercover agents and informants, analyzing pen register and telephone toll data, drafting and execution of judicially approved wiretap orders, the supervision of a wiretap investigation, drafting and executing search and seizure warrants seeking seizure of illegal drugs, currency and other evidence of drug violations, and debriefing persons arrested and convicted of drug trafficking offenses about their illegal activity. Through investigation and training, I have become familiar with the types and amounts of profits made by drug dealers and the methods, language, and terms which are used to disguise their illegal activity.

5. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing: (1) the examination of property currently in law enforcement possession; and (2) the extraction of electronically stored information from that property (said property hereinafter collectively referred to as "Subject Property").

## II.     PROPERTY TO BE EXAMINED

7. The Subject Property – consisting of sixteen (16) cell phones; one (1) desktop computer; one (1) digital video recorder ("DVR"); and one (1) computer tablet – is currently in the possession of the DEA Office on Guam. Photographs and descriptions of the Subject Property are shown in Attachment A.

8. Based on my training and experience, I know the Subject Property has been stored in a manner such that their contents are, to the extent material to this investigation, in substantially the same state as they were when it first came into law enforcement's possession.

9. The purpose of the search is to seize electronically stored data and information that may constitute evidence of the crimes charged as further described in Attachment B.

10. Pending Court authorization, the DEA will conduct forensic examination of the Subject Property at the DEA Office on Guam.

### III. APPLICABLE LAW

11. Title 21, United States Code, Sections 841(a)(1) and 846 make it a federal crime to conspire to possess with intent to distribute a controlled substance. Methamphetamine is a controlled substance. The elements of a violation of 21 U.S.C. §§ 841(a)(1) and 846 are as follows:

   a. First, there was an agreement between two or more persons to possess with the intent to distribute methamphetamine; and

   b. Second, the defendant joined in the agreement knowing of its purpose and intending to help accomplish that purpose.

12. Title 21, United States Code, Sections 856(a)(1) and 846 make it a federal crime to conspire to maintain a drug-involved premises. The elements of a violation of 21 U.S.C. §§ 856(a)(1) and 846 are as follows:

   a. First, there was an agreement between two or more persons to open, lease, rent, use, or maintain any place, whether permanently or temporarily, for the purpose of manufacturing, distributing, or using any controlled substance; and

   b. Second, the defendant joined in the agreement knowing of its purpose and intending to help accomplish that purpose.

### IV.  BASIS OF INFORMATION

13. As a result of your Affiant's personal participation in this investigation, and reports to the Affiant by other law enforcement officers, your Affiant is familiar with the facts and circumstances described in this affidavit.

14. The target of this investigation is a drug trafficking organization (DTO) being operated by Huaishu Wang, on the island of Saipan. Information about the DTO has been provided and gathered by your Affiant and other investigators; through Methamphetamine seizure by CNMI Customs; surveillance; meetings and discussions with other investigators, agents, and officers from the CNMI Department of Public Safety (DPS), CNMI Homeland Security Officers, CNMI Customs, and the CNMI Drug Enforcement Task Force (DETF), along with other investigative techniques. Except as otherwise noted, the information set forth in this affidavit has been provided to me by other law enforcement agents or officers. Unless otherwise noted, whenever in this affidavit I assert that a statement was made, the information was provided by another law enforcement officer (who may have had either direct or hearsay knowledge of the statement) to whom I have spoken or whose report I have read and reviewed.

15. Because this affidavit is being submitted for the limited purpose of searching the property listed in Attachment "A," I have not included each and every fact known to me concerning this investigation. Rather, I have set forth only the facts that I believe are necessary to establish probable cause to seize the properties listed herein.

### V.  PROBABLE CAUSE FOR SEARCH WARRANT

16. On May 2, 2022, CNMI Customs officers searched a U.S. Parcel post addressed to ▬▬ PO Box ▬▬ Saipan MP 96950. The package contained two packages of suspected methamphetamine. Package #1 contained approximately 493.4 grams, and Package #2 contained approximately 504 grams. Both packages presumptively tested positive for methamphetamine.

4

The address is to CCC Mail Service, which is a private mailbox company. The owner of the company confirmed an individual named ▒▒▒ rented a Private Mail Box (PMB) ▒▒▒

17. CNMI Customs removed the suspected methamphetamine and replaced it with "Sham," which is a non-controlled substance. CNMI Customs resealed the package and transferred custody to a CCC Mail Service representative. Law Enforcement maintained surveillance on the package and of CCC Mail Service. At approximately 2:40 p.m., a CCC Mail Service representative called the telephone number on the PMB rental agreement for PMB ▒▒▒ 670-▒▒▒ to inform them that a package had arrived. Law Enforcement overheard the conversation. A male answered the phone and identified himself as ▒▒▒ and stated he would pick up the package. Law Enforcement maintained surveillance of the package and CCC Mail Service until 5:00 p.m., when CCC Mail Service closed. CNMI Customs retrieved the package and maintained custody until the next day.

18. On May 3, 2022, at approximately 8:45 a.m., surveillance was re-established at CCC Mail Service. CNMI Customs relinquished the package back to CCC Mail Service. At approximately 11:13 a.m., a Toyota Rav 4 vehicle arrived bearing the license plate ▒▒▒, and a female wearing a white shirt, blue hat, (later identified as Hongjie Li) exited the vehicle and went inside CCC Mail Service. The Li took custody of the package and walked it back to her vehicle and attempted to place it in the passenger seat. Li eventually placed the package in the trunk and departed.

19. Law Enforcement maintained surveillance of the vehicle, which drove toward the San Vicente area, and, based on my training and experience, conducted counter-surveillance by circling the San Vicente Elementary School and attempting to lose any possible Law Enforcement surveillance. After circling San Vicente Elementary School, Li drove to a residence located 15.▒▒▒ Deg. North, 145.▒▒▒ Deg. East.

5

20.	Law Enforcement arrived moments later and observed Huaishu Wang with the package and a knife in his hand ready to open the package just outside of the residence. Law Enforcement detained Li and Wang and seized their cellphones that were in their possession. Wang's cellphone is **TARGET PHONE EXHIBIT N-4**. Li's cellphone is **TARGET PHONE EXHIBIT N-5.**

21.	After detaining the two individuals, Law Enforcement secured the area around the house, and while doing so, saw a man sleeping inside the residence through a window. Law Enforcement also observed that three (3) security cameras near the front door were rotating and appeared to be following the presence of officers. At that time, Law Enforcement made the decision to enter the residence in order to secure it for officer safety, as well as prevent the destruction of evidence. During the safety sweep, Law Enforcement detained Yongbing Ni inside the residence (the one previously seen sleeping), and observed, in plain sight, apparent methamphetamine, plastic baggies, bundles of currency, and sophisticated surveillance cameras with DVR and monitors.

22.	After the safety sweep was completed, Law Enforcement exited the residence and maintained security outside until a Search Warrant could be issued.

23.	At approximately 4:30 p.m., a federal search warrant was obtained, signed by the Honorable Magistrate Judge Heather Kennedy. At approximately 4:45 p.m., investigators executed the search warrant.

24.	The interior of the house was found to be void of any family photos, or other common items found to personalize a family residence. Most of the furniture was self-constructed for purely utilitarian purposes. There were no plates, cups, silverware, or other common kitchen utensils. The kitchen table was poorly self-constructed. Seating was a wooden bench and a small filthy love seat. A man-size propane tank was in the middle of the living room. Two of the

bedrooms contained multiple bottles of what appeared to be urine. Some of the beds did not have common bed frames and were laying directly on the floor. Many of the rooms in the house had no furniture. Multiple rooms had bongs out in the open. The overall condition of the house was obscenely filthy. Based on my training and experience, this house resembled a drug den. Based on my training and experience, I know drug dens often employ people to act as security guards to protect the narcotics. These security guards often are paid in free narcotics.

25. Investigators seized the following items from the master bedroom which Huaishu Wang used:

    a. Approximately 251 gross grams of suspected methamphetamine;

    b. Approximately 1,400 small Ziplock style baggies;

    c. $65,408 dollars in U.S. Currency;

    d. Three Airsoft/BB guns;

    e. **TARGET PHONES EXHIBIT N-14**;

    f. **TARGET DVR EXHIBIT N-18**;

    g. **TARGET COMPUTER EXHIBIT N-16**.

26. Investigators seized the following items from the bedroom Yongbing Ni was found sleeping in:

    a. Suspected methamphetamine;

    b. A bottle with straws used to smoke methamphetamine;

    c. Airsoft/BB gun;

    d. **TARGET PHONES EXHIBIT N-21**.

27. Investigators seized from the hallway closet **TARGET PHONE EXHIBIT N-17**.

28.     All three arrestees were transported to the CNMI Drug Enforcement Task Force (DETF) for interviews. All three were read their *Miranda* Warnings, via translator, and agreed to talk to investigators.

29.     *Statements of Hongjie LI.* LI stated she has been living at the house for approximately six weeks. This was the first box that she has picked up for Huaishu WANG. WANG instructed her how to drive and make sure no one followed her back to the residence. She stated she took the box out of the car and placed it on the ground and WANG picked the box back up. She admitted to helping WANG measure and package methamphetamine (for sales). She also said that WANG received 200 grams of methamphetamine a few days ago. LI stated that WANG used coffee filters to change the color of the methamphetamine. Based on my training and experience and conversations with other Law Enforcement Officers, I know methamphetamine users will save their urine and concentrate it down and filter out additional methamphetamine.

30.     *Statements of Huaishu WANG.* WANG stated he was an informant for the Police and needed to stay in the drug community, but later admitted to no longer working for the Police. WANG said this package (the approximate 1 kilograms of methamphetamine) was a small amount, and he was waiting for a big amount to tell the Police. WANG said he was not allowed to open the box but was to hold it for the boss. WANG denied he was going to pay LI. The airsoft guns were for shooting rats and birds. WANG admitted to smoking and selling methamphetamine. During the execution of the search warrant, WANG was asked to sign a DEA Self-Sealing Evidence Envelope that contained a large amount of money. When WANG saw the money, he exclaimed, "Yea…that's my money." Later he said it was Hongjie LI's.

31.     According to records obtained from the CNMI Superior Court, WANG was arrested on January 24, 2020, on local drug trafficking charges. The arrest arose from a controlled-buy operation conducted by the CNMI Drug Enforcement Task Force (DETF) on December 19,

2019. Although WANG was eventually released on his own recognizance, he was re-arrested on June 20, 2020, because he had "not complied with the Stipulation orders signed by Honorable Judge Joseph N. Camacho, and has failed to cooperate with Law Enforcement in on-going investigations, including but not limited to providing substantial assistance and accurate information to Law Enforcement." The charges against WANG, however, were dismissed without prejudice on July 6, 2020.

32. *Statements of Yongbing NI.* NI stated his back hurts and uses methamphetamine for his back, and he gets it free from Huaishu WANG for helping around the house. He stays in the bedroom that he was sleeping in during his arrest. He stated the airsoft gun in his room was to shoot rats.

33. Furthermore, during the interviews, Huaishu Wang granted permission to search his cellphone (**TARGET PHONE EXHIBIT N-4**) and signed a waiver stating as such and gave his passcode to **TARGET PHONE EXHIBIT N-4**. Hongjie Li granted permission to search her cellphone (**TARGET PHONE EXHIBIT N-5**). Translator CNMI Customs Officer Yan Che Magofna conducted a preliminary review of **TARGET PHONE EXHIBIT N-4** and **TARGET PHONE EXHIBIT N-5** and observed drug-related conversations.

34. Based on my training, experience, knowledge of this investigation, and knowledge of other investigations, I know that criminals often use cellular phones to communicate instructions, plans, and intentions to their criminal associates and to report on the progress of their criminal activities. I am also aware that evidence of these instructions, plans, intentions, reports and general discussions of criminal activity are sent or received in the form of text messages, incoming and outgoing call histories or voice messages left in personal voice mail systems. I am familiar in the methods in which text messages are sent and received via third party phone applications, most commonly referred to as "Apps," which are widely used.

35. Based on my training, experience, knowledge of this investigation, and knowledge of other investigations, I am aware that criminal organizations often use multiple telecommunication devices, numbers and multiple cellular telephones in an effort to thwart law enforcement efforts to investigate them. I also know that criminals commonly "switch" telephone numbers in the course of their activities for the same reasons.

36. Based on my training and experience, I know that drug dealers often use security cameras on their drug stash houses to know of any law enforcement activities at the location. I know many of the security cameras can be operated remotely via an application using the internet, and can be recorded on Digital Video Recorders (DVR). In order for the cameras to be remotely operated, the cameras must be connected to a computer to send the images to the internet.

## VI. ELECTRONIC STORAGE AND FORENSIC ANALYSIS

37. Based on my knowledge, training, and experience, I know that electronic devices, such as the Subject Property, can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

38. There is probable cause to believe that things that were once stored on the Subject Property may still be stored there, for at least the following reasons:

    a. Based on my knowledge, training, and experience, I know that electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a

computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

39. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Subject Property was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Subject Property because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a

file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual

information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

40. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Subject Property consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

41. *Manner of execution.* Because this warrant seeks only permission to examine the Subject Property, which is already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

42. Subject to requests for an extension in the event there is unforeseen difficulty in obtaining a verified image or accessing and analyzing the data contained therein, agents will complete the forensic imaging of the Subject Property within fourteen (14) days.

## VII. CONCLUSION

43. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Subject Property described in Attachment A to seek the items described in Attachment B.

44. I have shown this affidavit and the accompanying search warrant to Assistant United States Attorney Garth Backe, and he informs me that the affidavit is in proper form.

_____
Robert J. DeRocher, Special Agent
Saipan Post of Duty
Drug Enforcement Administration

Subscribed and sworn to before me
On May 12, 2022:

_____
Hon. Ramona V. Manglona, Chief Judge
United States District Court
District of the Northern Mariana Islands

ATTACHMENT A: Property to be searched

| | |
|---|---|
| **Target phone Exhibit N-4** – Seized from the possession of Huaishu Wang at the time of his arrest. Further described as a Gray Samsung with IMEI 350336267417396. Huaishu Wang granted consent to search this phone. | |
| **Target phone Exhibit N-5** – Seized from the possession of Hongjie Li at the time of her arrest. Further described as a Blue Apple iPhone. Hongjie Li granted consent to search this phone. | |
| **Target phones Exhibit N-14**<br><br>- Blue Galaxy S10 with green case containing CNMI Driver's license for Huaishu Wang. | |
| - Silver/gray Samsung phone with IMEI 353817662007632 | |
| - White Huawei Tablet | |
| - Dark gray Samsung with IMEI 352859/30/209373/0 | |

15

| | | |
|---|---|---|
| - Unknown make or model phone with yellow duct tape on back with the writing "284-1413". | | |
| - Samsung Galaxy S9+ with IMEI 35642009005500 | | |
| - Samsung unknown model with screen completely removed. | | |
| - Samsung unknown model with IMEI 350247/87/419242/3 | | |
| - Purple Xiaomi Communications phone with "M1804C3CC" printed on the back. | | |
| - Purple Samsung Galaxy S9 with IMEI 359945090196034 | | |
| **Target Computer Exhibit N-16** – HP Pro Desk 600 G2 Desktop mini with serial number 6CR65064XT | | |

16

| | |
|---|---|
| **Target Phone Exhibit N-17** – Red Samsung with IMEI 353415/11/157918/4 | |
| **Target DVR Exhibit N-18** – DVR Model 4NK3-C with serial number 2021623001 | |
| **Target Phones Exhibit N-21** <br><br> - Blue Galaxy Note 9 with Dark blue case and IMEI35656909213761 | |
| - Gold Color Samsung | |
| - Rose color iPhone | |
| - Red Samsung phone with IMEI scratched out | |

17

**ATTACHMENT B**

All items, records, files, or materials accessed, used, or saved from the Subject Property described in Attachment A, which constitute evidence, instrumentalities, or fruits of violations of Conspiracy to Possess with Intent to Distribute a Federally Controlled Substance (Methamphetamine), in violation of Title 21, United States Code, Sections 841(a)(1) and 846, and Conspiracy to Maintain a Drug-Involved Premises, in violation of Title 21, United States Code, Sections 856(a)(1) and 846, occurring between December 1, 2019, and May 3, 2022, including the following:

a. Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show address book information, including all stored or saved telephone numbers;

b. Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

c. Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the purchase, sale, transportation, distribution, transfer, or use of drugs or the collection, transfer or laundering of the proceeds of illegal activities;

d. Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as WeChat, Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

e. Data, records, documents, programs, applications or materials relating to the possession, purchase, sale, transportation, distribution, transfer, or use of drugs, and/or ammunition, including correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed;

f. Audio recordings, pictures, video recordings or still captured images relating to drugs;

g. Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations;

h. Any device used to facilitate the above-listed violations (and forensic copies thereof).

i. With respect to the device used to facilitate the above-listed violations or containing evidence falling within the scope of the foregoing categories of items to be seized:

  i. evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii. evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v. evidence of the times the device was used;

vi. passwords, encryption keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii. records of or information about Internet Protocol addresses used by the device;

ix. records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.